**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ROBERT MANINO,

                          Plaintiff,                    **REPORT AND**
                                                        **RECOMMENDATION**

              - against -                               CV 06-3078 (ARR) (JO)

SUPERINTENDENT DALE ARTUS,
                                    Defendant.
--------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

      Petitioner Robert Manino ("Manino") seeks a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. He is currently incarcerated following his conviction in 2000 in New York Supreme

Court, Queens County, of first-degree robbery and related charges. Docket Entry ("DE") 1

(Petition). Manino contends that he is entitled to relief for three reasons. First, he claims that the

trial court deprived him of a fair trial, and thereby violated his right to due process of law, by

admitting evidence of Manino's participation in five uncharged robberies as proof of his identity

as the perpetrator of the charged crimes. Second, he faults the trial court for the way it responded

to a message from the jury stating, for the third time, that it was deadlocked and reporting that it

was divided by a vote of eleven to one: specifically, the court denied Manino's motion for a

mistrial and instead gave a third *Allen* charge. Finally, Manino argues that he was deprived of

the effective assistance of appellate counsel; in particular he complains that his appellate counsel

improperly decided over Manino's objection to brief only a single issue on direct appeal (the

admission of evidence of uncharged crimes), and left Manino to fend for himself in raising other

issues. The Honorable Allyne R. Ross, United States District Judge, referred the matter to me for

a report and recommendation. I now make my report and, for the reasons set forth below,

respectfully recommend that the court deny the petition.

## I.  Background

### A.  The Charged Robbery And Manino's Arrest

On February 10, 1999, Dorothy McCloskey ("McCloskey") went for a morning run in her neighborhood in Howard Beach, Queens, pushing her then sixteen-month-old son in a jogging stroller.  She returned home at approximately 10:30 a.m.  After checking her phone for messages and allowing her son to finish his bottle, McCloskey removed her son from the stroller and seated him near the front door, locking the door as she did so.  When she turned around, she saw a man pointing a gun at her.  DE 13,[1] TT 1441-43, 1446-47, 1533-54.

McCloskey picked up her son and tried to escape but the intruder tackled her before she reached the door.  During the ensuing scuffle the intruder lost his gun but produced a knife; he threatened to kill McCloskey's son if the child did not stop screaming.  The intruder pulled McCloskey to her feet by her hair and pushed her onto a couch.  He removed several black plastic ties from his pocket and told McCloskey that he was going to tie her up; she resisted, pleading that her child was asthmatic and would not survive.  The intruder relented and demanded money and jewelry.  He forced McCloskey into the bedroom and gathered whatever valuables he could find.  Before leaving the house, he pushed McCloskey and her son into a

---

[1] DE 13 consists of the entire state court record, including records of Manino's trial, his direct appeal, and his motion for collateral relief in the form of a writ of error *coram nobis*.  The trial records include the transcript of the jury trial ("TT"), the transcript of a pretrial evidentiary hearing concerning the admissibility of evidence of uncharged crimes ("TH"), and the transcripts of several other hearings including the sentencing proceeding.  The appellate records include the brief that Manino's appointed counsel submitted on his behalf ("App. Br."), the supplemental brief that Manino submitted *pro se* ("*Pro Se* Br."), and the prosecutor's briefs in response to each; it also includes certain correspondence between Manino and his appointed appellate counsel.  The records of the *coram nobis* motion proceedings include the motion that Manino submitted *pro se* ("*Pro Se* Motion"), a supplemental brief submitted by appointed counsel on Manino's behalf ("Motion Br."), and the prosecutor's briefs in response to each.

bathroom and threatened that "he would be back for [them]" unless they remained in the bathroom while McCloskey counted to 100. After several minutes, McCloskey fled with her son to her neighbor's house next door. TT 1450-62, 1491-92.

McCloskey's neighbor called the police. Once they arrived, McCloskey told them that her assailant was a white male between the ages of 35 and 40, approximately five feet nine inches tall, 200 pounds, with salt-and-pepper hair, and that he had been wearing a black leather jacket. TT 1138. The police recovered a tan bandana from McCloskey's living room. Transcript of Hearing dated December 2, 1999 ("TH") 36; TT 917, 1477, 1490-91.

Just over a month later, on March 12, 1999, Manino – wearing a black leather jacket – was arrested in Staten Island and charged with a series of robberies committed in that borough. *See People v. Manino*, 707 N.Y.S.2d 302, 304 (Sup. Ct. 2000). That same day, McCloskey traveled to the precinct house in Staten Island to view a line-up; she positively identified Manino as the man who had robbed her a month before. TT 1140, 1495-96. Manino was subsequently charged with several crimes arising from the events at McCloskey's home: two counts of first-degree robbery, one count of second-degree robbery, two counts of first-degree burglary, one count of endangering the welfare of a child, and two counts of second-degree unlawful imprisonment. *See* TT 1936-53; N.Y. Penal L. §§ 160.15[3] & [4], 160.10[2], 140.30[3] & [4], 260.10[1], 135.05.

B.    Trial Court Proceedings

1.    The Motion To Exclude Evidence Of Uncharged Crimes

Before the start of Manino's trial on the charges stemming from the robbery in McCloskey's home, the prosecution moved *in limine* to introduce evidence of five robberies that

3

Manino also allegedly committed – four in Staten Island and one in Brooklyn – for the purpose of identifying Manino as the perpetrator of the robbery with which he was charged. TH 7. At the hearing on the motion, Detective Sean Kennedy ("Kennedy") of the New York City Police Department's Staten Island Robbery Squad testified about the circumstances of each of the five uncharged robberies. TH at 18-34. He explained that the police department was treating the crimes as related, that he had spoken with the complainant in each case, that each had provided a description of the robber, and that each had identified Manino as the robber during a line-up on March 12, 1999. TH 18-19, 22, 25, 27, 30, 33-34, 45.

Based on Detective Kennedy's testimony, the court found that the uncharged crimes and the robbery of McCloskey with which Manino was charged in this case all shared a unique *modus operandi*.

> Analyzing the five other cases, all involved a home entry, either by force or subterfuge, followed by a fixed pattern of advising the victim that he was not there to harm but only to rob cash or jewelry. In four of the five cases, the complainants were dragged by the hair. All but Dorothy McCloskey were brought upstairs while the perpetrator searched the bedroom. Then the victims were taken downstairs and told they would have to be hidden. The majority were tied up in the basement with appliance cords or plastic ties. Thus, the actual patterns of the robberies included similar acts, repeated statements and a step by step criminal routine. A knife and bandana were used in all cases and a black leather jacket in most of them. Each victim identified the knife recovered from defendant's house as the knife used in the robberies. These robberies could be called unique ... in that they exhibited so many common similarities as to create a distinctive *modus operandi* ... which is applicable to the Queens case.

707 N.Y.S.2d at 307 (citing *People v. Condon*, 309 N.Y.S.2d 152 (1970); *People v. Mateo*, 690 N.Y.S.2d 527, 530-31 (1999)). The court further found that the complainants' similar descriptions of their assailant and the fact that each identified Manino in the March 12 line-up sufficed to establish his identity as the perpetrator of those crimes. *Id*. As a result, the court

permitted the prosecution to introduce evidence of five uncharged robberies to prove Manino's guilt of a sixth.[2]

<h3 align="center">2.   Jury Deliberations And The Court's *Allen* Charges</h3>

Manino's trial lasted approximately three weeks. TT 2028. The jury heard from several witnesses, including McCloskey, the complainants in each of the five uncharged robberies, and police detectives testifying about each of the charged and uncharged crimes. The parties' respective attorneys gave their closing arguments on February 9, 2000, and the jury began deliberating that evening. TT 1959. Over the course of three days, the jury sent more than twenty notes to the court seeking a variety of information related to the trial and at times advising the court of the status of its deliberations. Four of those notes, and the court's responses to them, are relevant to the instant petition.

On February 11, 2000 – the second full day of deliberations – the jury sent a note to the court advising that it was deadlocked and requesting assistance. TT 1988-89. The court proposed to respond by giving the jury a standard *Allen* charge – a supplemental instruction given by the court that encourages members of the jury to do their best to try to reach a verdict. TT 1988 ("What I'm going to give them [is] the CJI 42.60, jury's failure to agree which is the last thing I say to them. You have a duty to deliberate to be fair and impartial and listen to everyone's view."); *see Allen v. United States*, 164 U.S. 492, 501-02 (1896). Neither party objected to the proposal, and the court accordingly instructed the jurors to continue their deliberations "with a

---

[2]  Manino was later convicted of one of the other robberies after a separate trial, and his direct appeal of that conviction was unsuccessful. *See People v. Manino*, 761 N.Y.S.2d 851 (App. Div. 2003). This court has already denied the petition for collateral relief that Manino filed as a result of that conviction. *See Manino v. Smith*, 2005 WL 1006019 (E.D.N.Y. Apr. 27, 2005).

view to reaching an agreement" but without "surrender[ing] [their] honest convictions ... for the mere purpose of returning a verdict."  TT 1989-90.

Several hours later, the court simultaneously received two more notes that together revealed not only an apparent impasse among the jurors, but also that they were divided by a vote of eleven to one in favor of conviction.  The first note, from the jury as a whole, read as follows:

> After hours of deliberations we feel that we cannot come to a conclusion regarding this case.  We tried to explain to one of the jurors all the evidence that was presented to us is a fair an reasonable manner but she kept making excuses as to the defendant's innocence based on the fact that there is no DNA evidence and no fingerprints.  It has been a battle of sorts to continue – to try to convince this person and she refuses to be reasonable.  We are constantly disagreeing about every little matter and feel we will never render a verdict.

TT 1996.  The second note was signed only by "Juror 11" and read as follows:

> Honorable Judge, during the process of finding the truth there is a great pressure on juror 11 to agree with the others' decision.  I feel that I owe to the defendant judicial system that analyzes me all of the facts with no personal passion is our duty.  With a great burden of being pressured to deny my realization about the facts.

*Id*.

Once again, the court proposed to respond to the jurors' communications by giving them an *Allen* charge.  Specifically, the court informed the parties that it would give a supplemental instruction "which tells them basically to try to reach a verdict.  Don't violate your feelings.  If you have a position hold on to it if you feel it's valid."  TT 1996-97.  Again, neither party objected, and the court thereafter instructed the jurors to review the evidence, listen to the views of their fellow jurors, and make every effort to reach a verdict.  TT 1997-99.  The jury again retired to resume its deliberations.  TT 1999.

The following day, February 12, 2000, the court received another note from the jury:

Honorable Judge, after trying for another night and another day to deliberate about this case I regret to inform you that we are unable to reach a unanimous decision regarding this case. We were very close to reaching a verdict but a juror honestly believes the defendant is not the right person. She has lots of doubts and no matter what we said or do she thinks it's impossible to complete our job.

TT 2029. This time, Manino's counsel objected to any further *Allen* charge and instead moved for a mistrial. Specifically, he pointed out that the jury had thrice expressed its inability to reach a verdict and that one juror, who appeared "adamant in her position," was feeling pressured by fellow jurors. In opposing the mistrial motion, the prosecutor noted and the court confirmed that although the jury was in its third day of deliberations, the majority of that time had been consumed by read-backs of trial testimony and supplemental legal instruction rather than actual deliberations. TT 2027-28.

The court denied Manino's motion. It agreed with the prosecutor that the jury had spent no more than half of the prior three days deliberating. With respect to the concern implicit in Manino's counsel's argument – namely, that the lone juror resisting conviction might be coerced into changing her vote – the court noted that such pressure is inherent in the deliberative process, particularly for those whose views are in the minority. The court further assured counsel that its proposed *Allen* charge would guard against such coercion by instructing the jurors not to abandon any honestly held convictions merely for the sake of reaching an agreement. TT 2028-29.

The court's third *Allen* charge was more forceful than either of its predecessors. The lengthy charge exhorted the panel members to "listen carefully to the other jurors and ... give them an honest chance to change your mind." TT 2030. It included the instruction that "[t]here is no shame in changing your mind if you are convinced from the evidence and the law that you

7

should.  You should not change your mind for any other reason[.]"  TT 2031.  The court also

asked the jurors to "understand that I am saying this to all of you and not to any single juror."  TT

2031.  The court ended by instructing the jurors that "you are under an oath to deliberate until

there are no further deliberations justified in this case.  This doesn't mean that you must change

your mind, but it does mean that every effort should be made by you consistent with the evidence

and the law to reach a verdict."  TT 2033.  Manino did not object to the language of the charge.

Less than an hour later the jury requested a read-back of counts six and seven of the

indictment.  TT 2035, 2040.  Thereafter the jury reached a unanimous verdict: it found Manino

guilty of one count of first-degree robbery, one count of first-degree burglary, one count of

endangering the welfare of a child, and one count of unlawful imprisonment; the jury acquitted

Manino of the remaining charges.  TT 2041-43.  The court later sentenced Manino on the robbery

and burglary charges to two concurrent prison terms of 25-years-to-life; it further imposed one-

year prison terms – concurrent with each other but consecutive to the terms for the first two

charges – on each of the remaining charges of unlawful imprisonment and endangering the

welfare of a child.  DE 10 (affidavit in opposition to petition for a writ of habeas corpus) at 5.

C.      Post-Conviction Proceedings

1.      Direct Appeal

Manino timely filed a notice of appeal of his conviction, and was represented on appeal

by new appointed counsel, Jay L. Weiner ("Weiner").  Manino communicated regularly with

Weiner, and he claims that he urged his attorney to raise a number of claims on appeal that he

believed to be meritorious.  DE 3 (Memorandum of Law in Support of Petition for a Writ of

Habeas Corpus) ("Memo.") at 20, 47.  Manino further claims that Weiner rejected such input,

telling his client that "I am a one punch lawyer, I only go for one issue regardless of how many there are." *Id.* at 47. Consistent with that approach, Weiner submitted an appellate brief that presented only one issue: whether the trial court erred by admitting evidence of the five uncharged robberies. Specifically, Weiner's brief argued on Manino's behalf that the court erred in admitting the evidence because any pattern that may have been common to the five uncharged robberies did not extend to the charged crimes, and that in any event the prejudicial effect of admitting the evidence five other robberies outweighed any probative value such evidence might have had in proving the one at issue in the case. App. Br. at 36. Weiner counseled Manino that if he wished to raise any additional issues, he should file a supplemental brief *pro se*. *See* Memo. at 47; DE 13, letter from Weiner to Manino dated Dec. 18, 2001.[3]

---

[3] Although Manino portrays Weiner as being inflexible on the matter, their correspondence suggests that Weiner at least considered including an argument in his appellate brief about the court's denial of the motion for a mistrial that Manino made after the jury declared itself deadlocked. *See* DE 13, letter from Weiner to Manino dated Oct. 26, 2001. Nevertheless, for purposes of resolving the petition, I respectfully recommend that the court deem Manino's description of his interactions with Weiner to be true. I would not normally recommend granting any relief on the basis of such allegations without affording Weiner an opportunity to present his recollection of the relevant communications and to explain his decision to brief only one issue on appeal. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam) ("a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs"). I did not convene a *Sparman* hearing in this case, however, because as explained below, I conclude that the court can and should deny the petition even if it assumes that Weiner did express such an inappropriately inflexible approach to appellate litigation. It is worth noting, however, that there is a great deal of difference between a lawyer telling a client that he will only brief one issue on appeal even at the expense of waiving other meritorious claims solely because that is the lawyer's preferred practice for reasons having nothing to do with a particular case, and a lawyer sharing his view that raising the one best issue on appeal is usually – and in the client's particular case is likely to be – the most successful appellate strategy. Although the nuanced difference between the two messages might be difficult for a lay client to discern, or to recall years after the fact, the former is almost certainly unreasonable performance for purposes of the Sixth Amendment right to counsel, while the latter is unassailable on collateral review.

Manino rejected Weiner's advice, and instead asked the court to strike Weiner's brief and appoint new counsel to represent him on appeal. The court denied the motion but granted Manino leave to file a *pro se* supplemental brief. Memo. at 48. Manino ultimately did so, challenging his conviction on two following additional grounds. First, he claimed that the court deprived him of a fair trial by receiving in evidence a recording of the call McCloskey's neighbor made to the police on the day of the charged robbery. Second, Manino argued that he was denied effective assistance of counsel because his trial counsel failed to have the bandana found in McCloskey's home tested for DNA. *Id.*; *Pro Se* Br. at 5, 14.

On June 30, 2003, the appellate court affirmed Manino's convictions. Specifically, it held that the trial court properly admitted the evidence of uncharged crimes and that the additional arguments Manino raised in his supplemental brief were without merit. *People v. Manino*, 761 N.Y.S.2d 850 (App. Div. 2003). The New York Court of Appeals denied Manino's request for leave to seek review of the latter decision on September 24, 2003. *People v. Manino*, 767 N.Y.S.2d 405 (2003).

2.     *Coram Nobis* Proceedings

On March 1, 2004, Manino filed a *pro se* petition for a writ of error *coram nobis* in the Appellate Division of the New York State Supreme Court. In his petition, Manino asked the court to vacate his convictions on the ground that Weiner's work as appellate counsel had been ineffective by virtue of Weiner's failure to brief and argue several issues. Specifically, Manino asserted that Weiner should have challenged the trial court's decision to give multiple *Allen* charges, the coercive language it used in those instructions, and its denial of the mistrial motion. Manino also faulted Weiner for failing to raise two claims based on the introduction of a bandana

that was presented as having been worn by the man who committed the charged robbery: Manino contended that appellate counsel should have argued that Manino's trial counsel was ineffective for failing to have the bandana tested for DNA evidence and that the prosecutor engaged in misconduct by offering the bandana without having performed such testing. *See Pro Se* Motion at 10, 12, 18, 22.

Before considering the merits of Manino's *pro se* motion, the court assigned Manino new counsel and granted Manino leave to file a brief on the issue of whether the trial court improperly denied the mistrial motion "in connection with the ... *Allen* charge." 778 N.Y.S.2d 283, 284 (App. Div. 2004). Taking some liberty with the scope of that mandate, in November 2004 Manino's new counsel submitted a supplemental brief that presented the following question:

> Whether the court deprived appellant of his rights to due process and a fair trial where it coerced a verdict from the deadlocked jury split 11 to 1 by denying appellant's mistrial motion and resubmitting the case with a third *Allen* charge after the jury told the court that a unanimous verdict was "impossible" because the lone holdout "honestly believes the defendant is not the right person."

Motion Br. at 3-4.

In a decision dated, July 11, 2005, the court denied Manino's *coram nobis* petition, writing as follows:

> The appellant failed to establish that he was denied the effective assistance of appellate counsel on the ground that appellate counsel failed to address the issue of whether the Supreme Court properly denied the defendant's motion for a mistrial after the jury indicated that it was deadlocked and, instead, delivered its third *Allen* charge. The record indicates that the Supreme Court providently exercised its discretion. Moreover, the defendant did not object to the charge as given and thus failed to preserve for appellate review any claim as to the language of the charge. In any event, the charge was not coercive.

*People v. Manino*, 797 N.Y.S.2d 758 (App. Div. 2005) (internal citations omitted).  The New

York Court of Appeals denied Manino's request for leave to seek review of the latter decision on

September 2, 2005.  *People v. Manino*, 804 N.Y.S.2d 45 (2005).

        D.     The Instant Habeas Proceedings

Manino filed the instant petition on June 15, 2006.  In it, he asserts three grounds for

relief.  First, he claims that the trial court deprived him of his constitutional right to due process

and a fair trial by giving the jury a third *Allen* charge; in particular, Manino objects both to the

decision to give the charge at all, and the language that the court used in delivering it, which

Manino characterizes as impermissibly coercive.  Second, he argues that the trial court also

denied his right to due process and a fair trial by admitting evidence of five uncharged robberies.

Third, Manino contends that his appellate counsel rendered ineffective assistance, in violation of

his right to appellate counsel, by raising only a single issue on direct appeal rather than the

multiple issues that Manino believes had merit.  Memo. at 29, 45, 59.

II.    Discussion

        A.     Timeliness

Manino's petition was timely filed.  After the Court of Appeals denied Manino's

application for leave to appeal on September 24, 2003, he had 90 days to seek further review in

the United States Supreme Court.  He did not do so, and his conviction accordingly became final

on December 23, 2003.  *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  Once the

conviction was final, Manino had one year in which to file the instant petition.  On March 1,

2004, when Manino filed his *coram nobis* application, 69 days had elapsed.  The statute of

limitations was tolled during the pendency of the *coram nobis* proceedings.  28 U.S.C.

§ 2244(d)(2).  Those proceedings ended on September 2, 2005, when the court denied his application for leave to appeal.   Manino's habeas petition was filed 286 days later, on June 15, 2006.  Accordingly, for purposes of the statute of limitations, Manino filed his petition 355 days – or less than one year –  after his conviction became final, and it is therefore timely.  28 U.S.C. § 2244(d)(1)(A).

B.    Standard of Review

A federal habeas court may grant relief on a claim that was decided by the state court on the merits only if it concludes that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent if it applies a legal rule that contradicts a rule set out in governing Supreme Court cases, or if it addresses a set of facts that are materially indistinguishable from those in a Supreme Court case and reaches a different result.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court decision is an "unreasonable application" of Supreme Court precedent if it identifies the correct legal rule but unreasonably applies it to the facts of a particular case, or if it unreasonably extends or refuses to extend a Supreme Court precedent.  *Id.* at 407.  The state court must, in addition to being incorrect, also be unreasonable. *Id.* at 411.  Habeas relief is unavailable unless the trial court's decision was "so plainly unconstitutional that it was objectively unreasonable" for the appellate court to conclude otherwise.  *Jimenez*, 458 F.3d at 147 (citing *Williams v. Taylor*, 529 U.S. at 409-10, 412).  With respect to any issue properly raised in a habeas petition that the state court did not determine on the merits, the deferential standard prescribed under AEDPA is inappropriate.  *Wiggins v. Smith*,

13

539 U.S. 510, 534 (2003) (applying *de novo* standard of review to part of federal claim not reached by state court); *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (applying *de novo* standard where it was "impossible to discern the Appellate Division's conclusion" on issue); *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (giving no AEDPA deference where petitioner's constitutional claim not adjudicated on the merits); *cf. Jimenez*, 458 F.3d at 143 (noting that a decision may still be "on the merits" when state court did not articulate its reasons for adjudicating the claim as it did).[4]

### C. Evidence Of Uncharged Crimes

In his first claim, Manino argues that the trial court deprived him of a fair trial by admitting testimony about five uncharged robberies on the ground that it demonstrated a unique *modus operandi* that would properly serve to establish Manino's identity as the man who robbed McCloskey. He claims this testimony did not meet the state law standard for admitting such evidence under such a theory. As a result, Manino complains, he was "tried on the basis of his propensity to commit the crimes charged" and not on the evidence that he was the individual who committed those crimes, and thereby deprived of his right to a fair trial and due process of law under the Sixth and Fourteenth Amendments. *See* Memo. at 60. As explained below, I conclude that Manino is not entitled to relief on this claim.

---

[4] Each of Manino's three claims involves its own issues of procedural viability and the appropriate standard of review. I therefore address such matters separately below. Briefly stated, however, I conclude that the state court did address the merits of all of the issues Manino presents to this court with the exception of his complaint that his appellate counsel was ineffective.

1.    Procedural Issues

As a state prisoner seeking federal habeas relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Manino must clear two procedural hurdles. First, he must show that he properly presented both the factual and legal premises of his claim to the state court. *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Second, the state court's decision to deny the claim must not rest an "independent and adequate state ground." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Harris v. Reed*, 489 U.S. 255, 261-62 (1989). An independent and adequate state ground is one that would support the judgment on its own, even if the state court's ruling on the federal claim is found to have been contrary to federal law. A common example is a state procedural rule rendering the claim forfeited under state law. *See Coleman*, 501 U.S. at 729-30; *Wainwright v. Sykes*, 433 U.S. 86-87 (1977); *Ulster County Court v. Allen*, 442 U.S. 140, 148 (1979).

Manino's first claim relating to the admission of evidence of uncharged crimes meets both of those requirements. He raised the substantive issue at trial and on direct appeal of his conviction, and the state court rejected his claim on the merits rather than on an independent state law procedural bar. 761 N.Y.S.2d 850. Accordingly, I respectfully recommend that the court address the claim's merits on direct appeal.

2.    Merits

Evidence of uncharged crimes is generally inadmissible under New York law except when such evidence is probative of a material element of the crime charged. *People v. Molineux*, 168 N.Y. 264, 293-94 (1901); *see also People v. Ventimiglia*, 52 N.Y.2d 350, 359 (1981) (evidence of prior crime admissible when probative value of evidence outweighs potential for

prejudice).  Such an exception may arise where the prosecutor can establish the defendant's identity as the perpetrator of the charged crime by proving, by clear and convincing evidence, that the method used to commit both the charged and uncharged crimes was sufficiently unique to make it "highly probable" that they were committed by the same individual, and that the defendant was the perpetrator of the uncharged crime.  *People v. Robinson*, 68 N.Y.2d 541, 549 (1986).

Manino's complaint that the court's admission of the evidence of other uncharged robberies was improper under New York law, standing alone, is insufficient because "federal habeas corpus relief does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Estelle v. McGuire*, 502 U.S. 62, 67 (1991);  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules").  Instead, Manino may only secure relief if he can demonstrate that the challenged evidentiary ruling violated an identifiable right he enjoys under the United States Constitution, such as the fundamental right to a fair trial guaranteed by the Due Process clause.  *See* 28 U.S.C. § 2241(c)(3); *Estelle*, 502 U.S. at 68; *Spencer v. Texas*, 385 U.S. 554, 563-564 (1967); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998).  This he cannot do.

Even if the court should not have admitted the evidence about which Manino complains, not all erroneous admissions of evidence rise to the level of a due process violation.  *Dunnigan*, 137 F.3d at 125.  The court's task is to determine whether the evidence was "so extremely unfair that its admission violates fundamental conceptions of justice."  *Id*. (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  Where prejudicial evidence is "probative of an essential

element in the case, its admission does not violate the defendant's right to due process."
*Dunnigan*, 137 F.3d at 125, (citing *Estelle*, 502 U.S. at 69) (internal quotation marks omitted).

The testimony was probative of an essential element in the case:  the identity of Manino as the

perpetrator.  Additionally, even an error violative of due process will merit habeas corpus relief

only if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

*Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S.

750, 776 (1946).  The evidence in question did not have such an effect as there was ample

evidence on which the jury could have based its verdict including, most notably, McCloskey's

identification of Manino as the man who robbed her.

The primary danger of the evidence about which Manino complains is the risk that he was

tried on the basis of his propensity to commit crimes, rather than on proof that he committed the

specific crimes with which he was charged.  Memo. at 60.  To be sure, the admission of evidence

that he committed five uncharged robberies created a severe risk of that kind, and its justification

on the ground that the various robberies shared characteristics so unique as to compel the

conclusion that Manino robbed McCloskey is hardly beyond criticism.  Nevertheless, given the

exacting standard for relief under AEDPA, Manino cannot prevail, because the United States

Supreme Court has never held that the admission of evidence to show propensity constitutes a

deprivation of due process.  *See Estelle*, 502 U.S. at 75 n.5 ("we express no opinion on whether a

state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence

to show propensity to commit a charged crime"); *Spencer*, 385 U.S. at 572-74 (stating that the

Supreme Court "has never held that the use of prior convictions to show nothing more than a

disposition to commit crime would violate the Due Process Clause of the Fourteenth

Amendment," but expressing belief that such use would violate due process) (Warren, C.J., concurring in part and dissenting in part). In the absence of clearly-established Supreme Court case law in this regard, Manino's first claim for relief must be denied. *See Allaway v. McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (denying habeas relief because "the Supreme Court has not yet clearly established when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation").

     D.     Jury Instructions

Manino next asserts that the trial court deprived him of a constitutionally fair trial when, in response to the jurors' third statement that they were unable to reach a verdict, it denied Manino's motion for a mistrial and instead gave a third *Allen* charge. In particular, Manino argues that the court's actions were unduly coercive in light of two notes, the first of which identified the existence of a single juror who "honestly believes the defendant is not the right person," TT 2029, and the second of which expressed that lone juror's feeling of "great pressure" from her colleagues to abandon her view of the evidence. TT 1996; *see* Memo. at 30-31.

     1.     Procedural Issues

As noted above, Manino must demonstrate both that he properly preserved his claims regarding the *Allen* charge by litigating them in state court, and that the state courts did not deny him relief based on an adequate and independent state ground. He can meet these procedural requirements to the extent he challenges the denial of his mistrial motion and the court's decision to give a third *Allen* charge: Manino litigated the matter in both the trial and appellate courts, and the latter denied Manino's request for relief on the merits.

However, Manino has not properly preserved for review by this court his criticism of the language the court used in delivering the challenged instruction. Manino raised no such objection at trial, and that failure was an adequate and independent basis for the denial of relief when he sought to raise the issue in seeking *coram nobis* relief. *See Manino*, 797 N.Y.S.2d at 758 ("the defendant did not object to the charge as given and thus failed to preserve for appellate review any claim as to the language of the charge") (citing *People v. Baher*, 765 N.Y.S.2d 771 (App. Div. 2003)).

To be sure, the state court also briefly addressed the merits of Manino's challenge to the language of the instruction by writing that "[i]n any event, the charge was not coercive[.]" *Id*. (citing *People v. Battle*, 790 N.Y.S.2d 477, 478 (App. Div. 2005); *Baher*, *supra*). In such circumstances, where a court discusses both state procedural and federal substantive grounds for its decision, there may exist some ambiguity as to whether the court intended to waive the state procedural ground and decide the claim on the merits. *Harris v. Reed*, 489 U.S. at 261-62.

In seeking to resolve such ambiguity, this court must "presume that there is no independent and adequate state ground for a state court decision" – and that it may therefore be subjected to federal collateral review – "when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Coleman*, 501 U.S. at 735 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)). But if the opinion contains "a clear and express statement of reliance on a state procedural bar," this court may not presume that the state court decision rested on the merits of the federal claim. *Jimenez*, 458 F.3d at 145.

The state court opinion in this case does contain such a clear indication: "the defendant ... failed to preserve for appellate review any claim as to the language of the charge." Moreover, the court's use of the introductory clause "[i]n any event" before making its summary observation that the challenged charge "was not coercive" indicates that the point was not necessary to its ruling. Reading the decision in context, it is impossible to avoid the conclusion that the state court's rejection of Manino's claim "fairly appear[s] to rest primarily on state procedural law." *Id*.; *cf. Ryan v. Miller*, 303 F.3d 231, 245-46 (2d Cir. 2002) (finding claim adjudicated on the merits when state court held "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit").

Manino can overcome the procedural bar to consideration of this portion of his claim if he can demonstrate both "cause" for his default and actual prejudice flowing from the substantive violation of federal law that he alleges; alternatively, the court can also consider the claim on its merits if the failure to do so will result in a fundamental miscarriage of justice. *Murray v. Carrier*, 477 U.S. 478, 485-86, 495 (1986). Neither exception to the usual procedural requirements applies here. First, Manino has failed to show cause for the failure to preserve an objection to the language of the court's *Allen* charge. While a defendant can establish such "cause" by demonstrating that his trial counsel was ineffective, *Murray*, 477 U.S. at 488-89, there was no such problem here. The record reveals that counsel was attentive in the courtroom and active in Manino's defense, both as a general matter and in particular with respect to the *Allen* charge. Before the court gave its third *Allen* charge, Manino's counsel asked the court not to do so and instead declare a mistrial. TT 2027. When that strategy proved unsuccessful, Manino's counsel successfully petitioned the trial court to include in its instruction cautionary language

reminding the jurors not to surrender any conscientiously held beliefs. TT 2028-29. Under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, such performance by Manino's counsel cannot be considered sufficiently unreasonable to support a finding of ineffectiveness. Moreover, even if, in retrospect, there was some aspect of the language of the court's third *Allen* charge to which counsel should have objected, Manino must bear the consequences of even an erroneous failure to do so, so long as that error did not deprive him of his Sixth Amendment right to effective counsel. *Murray*, 477 U.S. at 488. "Cause" is not established simply because an attorney may have made an error, but rather requires a showing that "some objective factor external to the defense" impeded counsel from preserving the claim. *Id*. Manino has not identified any such external cause for his counsel's failure to object to the language of the court's charge.

Second, Manino cannot demonstrate the a fundamental miscarriage of justice will result if the court does not review the merits of this part of his claim. Because an explanation of the latter conclusion inevitably requires a consideration of the substance of all of Manino's claim, I now proceed to a discussion of the merits. Briefly stated, however, Manino has failed to demonstrate that his objection to the language of the trial court's third *Allen* charge may properly be considered by this court in light of his procedural default.

2. Merits

There is no specific set of circumstances in which a court is obligated to declare a mistrial. The court should do so only when, in the sound discretion of the presiding judge, the discontinuance of the trial is a "manifest necessity." *See*, *e.g.*, *United States v. Perez*, 22 U.S. 579, 580 (1824). In particular, when a jury notifies the trial judge that it has reached an impasse,

the court need not declare a mistrial, but may instead instruct the panel members to continue their deliberations, advising them that they must listen with deference to the arguments of their fellow jurors and endeavor to reach a verdict. *Allen v. United States*, 164 U.S. 492, 501 (1896). As a result, the trial court's decision to deny a mistrial and instead to deliver a third *Allen* charge, standing alone cannot suffice to warrant the relief Manino seeks. Such relief would require a finding either that the specific circumstances required the court to grant a mistrial on the basis of manifest necessity, or that the language of the charge actually given was improper. Manino has not made the first showing and is procedurally barred from even attempting the second.

With respect to the propriety of the trial judge's decision to deliver a third *Allen* charge, I cannot conclude that the state court unreasonably applied Supreme Court case law in rejecting Manino's claim. Although it is rare that a court has occasion even to consider giving three *Allen* charges in a single case, the Supreme Court has never announced a *per se* prohibition of such a practice, and at least one case in this circuit has approved it where the language of the charge was not unduly coercive. *See Campos v. Portuondo*, 193 F. Supp. 2d 735, 747 (S.D.N.Y. 2002), *aff'd*, 320 F.3d 185 (2d Cir. 2003); *see also United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir. 1991) (judging propriety of a second charge in light of the circumstances).[5] Moreover, even

---

[5] The trial court's decision to deny the mistrial motion and give a third *Allen* charge, regardless of any concern about the precise language used (which Manino is procedurally barred from litigating in this court), might once have been more vulnerable to collateral attack in other circuits. *See United States v. Seawall*, 550 F.2d 1159, 1162-63 (9th Cir. 1977) (finding repetition of an *Allen* charge when jury has reported itself deadlocked is *per se* reversible error); *United States v. Barone*, 114 F.3d 1284, 1305 (1st Cir. 1997) ("there ought normally to be special circumstances, and not merely a continued inability by the jury to decide, to justify a second charge," but "each case must be judged on its own facts"). After the enactment of AEDPA, however, the lack of explicit Supreme Court case law on the matter would likely foreclose a challenge like the one Manino raises here even in such other jurisdictions.

if this court could second-guess the trial judge's discretionary decision, I believe there would be no good reason to disagree with it. After a trial of some three weeks, the jury had been deliberating for only three days, and had spent at least half of that time hearing read-backs and supplemental instructions. TT 2028. There is no reason to think that the jurors were so irremediably deadlocked that requiring them to continue deliberating would necessarily coerce any juror in the minority to abandon her principles.

Of course, even if an *Allen* instruction does not inevitably have a coercive effect, jurors in the minority can understandably view it as an exhortation to change their views. *Spears v. Greiner*, 459 F.3d 200, 205 n.3 (2d Cir. 2006). The appropriate question is thus whether the instruction "tends to coerce undecided jurors ... to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *Smalls v. Batista*, 191 F.3d 272, 278-79 (2d Cir. 1999); *see also Robinson*, 560 F.2d at 517; *Estelle*, 502 U.S. at 72. In conducting that inquiry, the court must consider the charge "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). As a result, the court must not artificially blind itself to the content of the instruction, notwithstanding Manino's failure to preserve a claim based precisely on an objection to that language. *See Campos*, 193 F.Supp.2d at 748 n.6 (although claim regarding language of *Allen* charge procedurally barred, it is impossible to address claim regarding coerciveness of charge without also addressing the text).

A consideration of the merits of the trial court's language in delivering the third *Allen* charge does not advance Manino's cause. That language explicitly reminded jurors that they "have no obligation to articulate the basis of [their] doubts," TT 2030, and that they "should not

change [their] mind for any other reason" than being convinced by the evidence and the law. TT

2031. Moreover, at the end of the instruction, the judge reminded the jurors that what he had just

said about continuing deliberations "doesn't mean that you must change your mind[.]" TT 2033.

Such language effectively conveyed to the jurors that they should not surrender their

conscientiously held views. *See Ruggiero*, 928 F.2d at 1299 (finding language that jurors should

not abandon their consciously held views "negate[s] coercion"); *cf. Smalls*, 191 F.3d at 278

(charge unconstitutional when it both obligated jurors to convince one another that one view was

superior to another and failed to remind jurors not to relinquish their own conscientiously held

beliefs).

To the extent Manino's challenge to the trial court's charge is predicated not simply on its

language, but on the additional fact that the court knew the jury was divided eleven-to one, that

too is an insufficient basis for relief. First, a court's knowledge of such a fact does not inherently

make an *Allen* charge any more coercive than it would otherwise be if the judge were ignorant of

the jury's numerical division. *See Robinson*, 560 F.2d at 516-18 (court properly issued two *Allen*

charges where it knew that juror count was eleven-to-one); *United States v. Martinez*, 446 F.2d

118, 119-20 (2d Cir. 1971) (court properly issued *Allen* charge when it knew the jury divided

eleven-to-one). Second, the trial judge took advantage of his knowledge in this regard to ensure

that his charge was tailored to *decrease* the likelihood that it would coerce the lone hold-out juror

into changing her view. Specifically, the judge instructed the jurors that they should "please

understand that I am saying this to all of you and not to any single individual." TT 2031.

Taking all the circumstances of this case into consideration, I must conclude that the state

courts did not render a decision that was contrary to or an unreasonable application of established

federal law in rejecting Manino's claims relating to the third *Allen* charge. I therefore respectfully recommend that the court deny Manino's second claim for relief.

E.     Ineffective Assistance of Appellate Counsel

In his final claim, Manino contends that his appellate counsel was ineffective because he raised only one issue on direct appeal (challenging the admission of evidence of uncharged crimes) and failed to accede to Manino's wish to raise several additional issues. Specifically, Manino argues that attorney Weiner should have submitted a brief challenging the trial court's conduct with respect to the third *Allen* charge, raising an ineffectiveness claim as a result of trial counsel's failure to secure DNA testing of the bandana allegedly worn by the man who committed the robbery, and attacking the prosecutor for improperly introducing that bandana without conducting such a test.[6] Memo. at 48-49. As explained below, I conclude that this challenge lacks merit and should be denied.

1.     Procedural Issues

a.     Exhaustion

Manino raised the ineffectiveness claim now before this court, in its entirety, as part of his petition for *coram nobis* relief in the state court. In particular, in both petitions Manino faulted Weiner for the attorney's failure to brief the same range of issues on direct appeal of Manino's conviction. *Compare* Memo. at 48-49 *with Pro Se* Motion at 6. As a result, Manino has sufficiently demonstrated that the courts of New York "had a fair opportunity to consider the

---

[6] Manino claims that defense counsel and the prosecutor failed to test the bandana for DNA evidence "after being instructed to do so by the presiding judge." Memo. at 48-49 (citing TH 10-13). I can find no support in the record – either in the pages that Manino cites or anywhere else – for the proposition that the trial judge gave any such instruction to any party.

... claim and to correct that asserted constitutional defect[.]" *Picard v. Connor*, 404 U.S. 270, 276 (1971); *see also Kines v. Butterworth*, 669 F.2d 6, 12 (1st Cir. 1981) ("We think that the arguments presented to the state court in appellants' brief provided that court with fair opportunity to consider the constitutional issues presented, although the court did not rule upon them in its decision."). The claim is therefore properly before this court.

b. Standard Of Review

While this court has jurisdiction to review the ineffectiveness claim on the merits, the manner in which the state court resolved the issue complicates the review here. As noted above, this court must defer to a state court's decision that addresses the merits of a petitioner's claim, and may only grant collateral relief if that decision was "so plainly unconstitutional that it was objectively unreasonable[.]" *Jimenez*, 458 F.3d at 147 (citing *Williams*, 529 U.S. at 409-10, 412). On the other hand, to the extent a state court does not reach the merits of a federal claim, a federal court considering a later habeas petition may engage in *de novo* review. *See Wiggins*, 539 U.S. at 534; *Boyette*, 246 F.3d at 91; *Washington*, 255 F.3d at 55.

Because the state court that rejected Manino's *coram nobis* petition addressed only some of the claims about Weiner's performance as Manino's appellate counsel, this court must give deference to that decision only in part. Specifically, the state court wrote the following with respect to the claim of ineffective assistance:

> The appellant failed to establish that he was denied the effective assistance of appellate counsel on the ground that appellate counsel failed to address the issue of whether the Supreme Court properly denied the defendant's motion for a mistrial after the jury indicated that it was deadlocked and, instead, delivered its third *Allen* charge.

797 N.Y.S.2d 758.  The court did not address the portion of Manino's claim that criticized Weiner's failure to raise appellate issues related to the trial court's admission in evidence of the bandana allegedly worn by the man who robbed McCloskey – namely, that Manino's trial counsel was ineffective for failing to have the bandana tested for DNA evidence, and that the prosecutor engaged in misconduct by offering the bandana without having performed such testing.

As a result, the court must apply AEDPA deference to the state court's rejection of the ineffective assistance claim to the extent it relates to issues surrounding the *Allen* charge, but it must review *de novo* the portion of the same claim to the extent it relates to issues surrounding the admission of the bandana.  However, because I conclude that Manino cannot prevail on the instant claim under any standard of review, I do not make such distinctions in the following analysis; instead, I consider the entire ineffectiveness claim *de novo* and find it meritless.

    2.    <u>Merits</u>

A defendant asserting that he was deprived of his right to the effective assistance of appellate counsel must satisfy two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, he must show that the attorney's performance was so unreasonably deficient that it the attorney did not function as the "counsel" guaranteed to the accused under the Sixth Amendment.[7]  Second, the defendant must demonstrate that he was actually prejudiced by the attorney's failure by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*. at 687, 694.

---

[7]  Although the federal Constitution does not inherently create a right to appellate review of a state criminal conviction, once a state chooses to create a right to such direct appellate review, the Sixth Amendment obliges it to provide the accused with effective counsel for such proceedings.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Douglas v. California*, 372 U.S. 353, 358 (1963).

The standard for constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 689-90. In the context of appellate representation, the constitutional standard of effectiveness does not require counsel to raise every non-frivolous claim a trial record might support. To the contrary, such a scattershot approach would usually be a poor strategy: an effective attorney often selects among meritorious claims in order to maximize the likelihood of success on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Where, as here, a convicted defendant's appellate counsel raises a potentially meritorious claim on appeal, a *Strickland* claim based on counsel's failure to raise a particular claim is unlikely to succeed. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) *cited in Smith v. Robbins*, 528 U.S. 259, 288 (2000).

The sole issue that Weiner briefed, challenging the trial court's admission of extensive testimony about five uncharged robberies, was likely the strongest claim available to him in pursuing a direct appeal of Manino's conviction. By using his entire brief to discuss that single issue, Weiner focused the appellate court's attention exclusively on one potentially successful argument. The identity of McCloskey's assailant was the central issue of the trial, and the prosecution put on fourteen witnesses to prove that it was Manino – only one of whom was a percipient witness to the charged offenses, and five of whom were the victims of uncharged

crimes.[8]  Manino based his defense on a claim of mistaken identity and presented four alibi

witnesses to show that he was not the perpetrator.  *See* TT 1640-65, 1665-1715, 1715-1732,

1741-1770.  In such circumstances, the propriety of letting so large a portion of the state's case

rest on the proof of uncharged crimes in which the supposed *modus operandi* was not fully

consistent from one occurrence to the next was plainly fertile ground for appellate argument.

Weiner addressed the issue credibly, presenting the court with a 50-page brief that contained both

detailed analysis of the facts and able application of the law.  Regardless of whether some other

attorney or judge might think it would have been a better strategy to raise other issues, if

Weiner's decision to raise only one issue on appeal represented a strategic choice made after a

thorough investigation of the facts and law, it is "virtually unchallengeable[.]"  *Strickland*, 466

U.S. at 690.

On the other hand, Manino could satisfy the "performance" prong of the *Strickland* test if

Weiner's decision was not a strategic choice based on a thorough review of the relevant facts and

law, but was instead an inflexible preference that he applied automatically in every case he

handled as appellate counsel.  Certainly, that is the import of Manino's assertion that when he

---

[8]  McCloskey identified Manino as her assailant.  TT 1495-96.  In addition to her testimony and
that of Detective Kennedy, the prosecution presented the testimony of McCloskey's neighbor
who transmitted McCloskey's description of the perpetrator to the 911 operator, TT 1007-16; the
911 operator who received the call, TT 1016-30; a detective to whom McCloskey described her
assailant and who conducted the line-up where McCloskey identified Manino, TT 1031-95, a
detective who assisted in the line-up, TT 1407-29, a forensic detective who attempted to recover
fingerprints and other forensic evidence at the scene of the crime, TT 901-79, an expert who
analyzed the recovered fingerprints and failed to find a match with Manino's fingerprints, 990-
1005, and a witness who found Manino's abandoned and burned car, TT 1395-1400.  The
remaining proof of Manino's identity was predicated on testimony by the victims of other
robberies supposedly committed with the same unique *modus operandi*, each of whom identified
Manino in a police line-up.  *See* TT 392, 597, 563, 635, 733-34, 833.

asked Weiner to raise additional issues on appeal, the lawyer responded by saying, "I am a one punch lawyer, I only go for one issue regardless of how many there are." Memo. at 47. Such a "one-size-fits-all" strategy would be entirely inconsistent with an attorney's ethical obligation to his client.[9]

The court need not resolve the factual question of whether Weiner's choice to submit a single issue on appeal was the product of a strategic choice to which it must defer or an unethical policy that would constitute unreasonable performance. Even if it was the latter, Manino could not secure relief from this court without showing a reasonable probability that the inclusion in Weiner's brief of at least one of the issues Manino asked the lawyer to brief would have secured him a new trial. Manino cannot establish such prejudice because none of the issues that Weiner declined to brief had substantive merit.

As discussed above, the decision whether to grant a mistrial after the jury declared itself deadlocked for a third time or instead to give a third *Allen* charge was committed to the trial

---

[9]  I do not mean to suggest that an ethical violation, without more, would suffice to show unreasonable performance for purposes of the *Strickland* standard. *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts"). And while an attorney's unethical usurpation of a decision that must ethically be left to the client could constitute unreasonable performance, that principle extends only to such fundamentally important matters as a defendant's decision "to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (quoting *Jones v. Barnes*, 463 U.S. at 751). Other strategic and tactical decisions – including the choice of issues to raise on an appeal that the client has authorized – are committed to the exercise of counsel's professional judgment after consultation with the client. *Jones v. Barnes*, 463 U.S. at 753 n.6. There is no "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Id*. at 751.

court's discretion, and required the judge to make a finding as to whether there was manifest necessity to end the jury's deliberations. The trial judge did not abuse that discretion, and as a result, any attempt by Weiner to secure appellate relief for Manino on that basis would have failed.[10] Any challenge to the specific language of the charge would similarly have failed, both because the charge was proper, as explained above, and because Manino waived any such complaint by failing to lodge a timely objection to the court's language.

The issues relating to the admission of the bandana were likewise meritless. The fact that Manino's trial counsel did not test the bandana for DNA evidence did not constitute ineffective assistance. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Any "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Here, trial counsel's decision not to test the bandana for DNA was reasonable in light of the other evidence tending to identify Manino as McCloskey's assailant, as the results may have further incriminated Manino. *See*, *e.g.*, *Samatar v. Clarridge*, 2006 WL 355684, at *19 (S.D. Ohio Feb. 16, 2006) (acknowledging failure to seek expert testimony may be tactical because expert might uncover evidence that further inculpates defendant); *Harris v. Metrish*, 2006 WL 1313804, at *5 (E.D. Mich. May 12, 2006) (counsel not ineffective for failing to test crime scene for DNA as petitioner's theory of unknown perpetrator highly speculative in light of identification testimony

---

[10] Indeed, Manino did attempt to persuade a state appellate court that he was entitled to relief on that basis, and he had the assistance of counsel in briefing the issue as part of his *coram nobis* petition. The court rejected his argument, and it plainly did not apply existing federal law unreasonably in doing so.

against defendant).[11]  Moreover, not testing the bandana was consistent with trial counsel's strategy of underscoring the lack of scientific evidence in the prosecution's case.  TT 1841-42. *See Loliscio v. Goord*, 263 F.3d 178 (2d Cir. 2001) (counsel not ineffective for failing to perform unconventional scientific test and instead calling to the jury's attention the prosecution's failure to employ such testing).[12]  In any event, Manino did raise that precise issue on direct appeal without success by submitting a supplemental brief *pro se*, and he has provided no sound reason to believe that the appellate court would have decided the matter differently if it had been briefed by Weiner rather than Manino.

Finally, the prosecutorial misconduct claim that Weiner declined to brief is equally infirm.  Prosecutors are under no constitutional obligation to test their evidence for DNA. *Arizona v. Youngblood*, 488 U.S. 51, 58-59 (due process clause not violated when the police fail to use a particular investigatory tool, in this case DNA testing); *Smith v. Edwards*, No. 98 Civ. 7962, 2000 WL 709005, at *6 (S.D.N.Y. May 31, 2000) ("there is no due process requirement that the government use any particular investigatory tool, including quantitative testing").

In the absence of any identifiable prejudice arising from Weiner's decision to brief only a single issue on direct appeal of Manino's conviction, Manino cannot establish that he was denied

---

[11]  It also appears to have been a reasonable conservation of resources, as there was little chance of recovering any DNA from the bandana to test.  *See* TT 940 ("[leaving saliva by] breathing though a napkin ... is not particularly [likely, as] ... air is one of the least likely [ways to transmit DNA]").

[12]  Even if Weiner had performed unreasonably in failing to test the bandana, Manino would still not be entitled to relief on this part of his claim.  To show that he was prejudiced by his appellate counsel's failure to argue that his trial counsel was ineffective, Manino would have to show a reasonable probability that a test of the bandana would have produced a different outcome at trial.  Without knowing what such a test would have shown, Manino cannot possibly carry that burden.

the effective assistance of appellate counsel. As a result, the court cannot, under any standard of review, grant this portion of his claim for habeas relief.

III.     Recommendation

For the reasons set forth above, I respectfully recommend that the court deny Robert Manino's petition for a writ of habeas corpus.

IV.     Objections

I direct the respondent to serve a copy of this Report and Recommendation on the petitioner by certified mail, and to file proof of service with the court no later than January 9, 2009. Any objections to this Report and Recommendation must be filed no later than January 26, 2009. Failure to file objections within this period waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Beverly v. Walker*, 118 F.3d 900 (2d. Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52 (2d Cir. 1996).

**SO ORDERED.**

Dated:  Brooklyn, New York
        December 31, 2008

                                        /s/ James Orenstein
                                        JAMES ORENSTEIN
                                        U.S. Magistrate Judge